THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: January 05, 2009



Honorable Pamela Pepper
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF WISCONSIN

---

| | | |
|---|---|---|
| IN RE: | JAMES REYNOLDS and<br>LORI REYNOLDS, | Case No. 07-30434-pp |
| | Debtors. | Chapter 7 |

---

**ORDER AND DECISION GRANTING THE UNITED STATES TRUSTEE'S
MOTION TO DISMISS AND GIVING THE DEBTORS
THIRTY (30) DAYS TO CONVERT OR BE DISMISSED**

---

The United States Trustee filed a motion to dismiss the debtors' case pursuant to 11 U.S.C. § 707(b)(3)(B), alleging that the totality of the debtors' financial circumstances demonstrated abuse of the provisions of Chapter 7. The debtors objected to the motion, asserting that they did not have sufficient income to make a meaningful repayment to their unsecured creditors. For the reasons that follow, the Court grants the trustee's motion to dismiss.

### I. FACTUAL BACKGROUND

On December 31, 2007, the debtors filed their Chapter 7 petition. Schedule I indicated that the debtor/husband had been a manufacturing supervisor at C&D

1

Technologies for the past seven years, making a monthly salary of $6,329.96. This net amount was reduced to a gross monthly income of $3,780.22 after the debtors subtracted payroll taxes, insurance, a $468.04 voluntary 401k contribution, and $580.90 per month for "life insurance, uniforms, 401K loan." Schedule I listed the debtor/wife as having been an assistant at JJ Freight Service for one month, making a monthly salary of $1,083.33.

The debtors' Schedule F reflected $170,521 in unsecured debt. The overwhelming majority of this debt was listed as "personal loan" and "credit card" debt. The debtors showed no priority unsecured creditors on their Schedule E. They stated that they planned to surrender their interests in a 2003 Dodge Sprinter and a 2005 Dodge Ram. This left as their major secured debts the mortgage on their home in Muskego, Wisconsin (which they valued on Schedule A at $304,000), a 2002 Toyota Camry valued at $9,000, and a 2004 Ford Mustang, valued at $13,000. The debtors had filed an agreement reaffirming the debt on the 2004 Ford Mustang.

The debtors completed Form B22A, the Statement of Current Monthly Income and Means Test Calculation. They "passed" the means test–in other words, their financial circumstances in the six full months prior to the petition date did not give rise to a presumption of abuse of the provisions of Chapter 7. The United States Trustee, however, filed a motion to dismiss the case pursuant to 11 U.S.C. §§ 707(b)(1) and (b)(3)(B), arguing that the totality of the debtors' circumstances constituted an abuse. The debtors objected, and the Court conducted an evidentiary hearing. The debtors and the debtor/husband's son, James Reynolds, Jr., testified at the hearing. The

2

following information is taken from the testimony the debtors and James, Jr. presented at the evidentiary hearing.

A.    The Debtor/Wife's Unemployment.

One of the bases for the trustee's motion was the fact that, while the schedules the debtors filed on December 31, 2007 showed the debtor/wife making $1,083 per month working as an assistant at JJ Freight, the debtor/wife became unemployed almost immediately after the petition date, and had not worked since. Both the debtors' attorney and the trustee questioned the debtor/wife extensively about her employment history.

The debtor/wife testified that she graduated from college in 2003 with a bachelor's degree in psychology. After graduation, she tried to find a job in the psychology field. All of the available positions she found, however, required a master's degree or higher. Lacking these higher degrees, she never worked in that field.

Before college, the debtor/wife had worked in a factory and as a secretary. She attempted to return to the clerical field after college by applying to Kelly Services and other, similar agencies for temporary work. She spent a half day testing at the Kelly Services agency. After she completed the tests, however, Kelly informed her that she no longer qualified to work as a secretary because she lacked the necessary computer skills. For this reason, she did not look any further for secretarial work.

The debtors previously had owned a cleaning franchise business. The debtor/wife testified that they had made money with this business, but had to shut it

3

down because she was physically unable to do the work. She testified that the debtors closed the cleaning business between three to three-and-a-half years ago.

In 2006, the debtors opened a vending machine business. They had started this business because they believed that the debtor/wife would be able to operate it. In addition, the debtors hoped to use the profit from the business to pay down the considerable debt that they had accrued. The vending machine business initially was successful, but after a while the machines needed extensive maintenance and sales decreased. Around that same time, the debtor/wife became physically unable to continue working with the vending machines; due to back and leg issues, she could not lift the heavy loads involved. The debtors had to close this business sometime in 2007.

The debtor/wife's most recent employment was the employment shown on the original Schedule I—as an assistant at JJ Freight. JJ Freight was an expedited freight business that delivered engines to the Harley Davidson Corporation throughout the United States. The owner of JJ Freight was James Reynolds Jr., the debtor/wife's stepson. James, Jr. testified that he employed his stepmother for one month in December 2007 to assist him with running errands and completing invoices when he was on the road making deliveries. He paid his stepmother $500.00 every two weeks for her services. Because of the rising cost of fuel and other items, James, Jr. could not afford to pay his stepmother beyond December 2007. The business ceased to be profitable, and at the time of the hearing, James, Jr. was in the process of closing JJ Freight. By January 1, 2008—a day after the debtors filed their petition—the debtor/wife was unemployed.

4

After she lost her job with JJ Freight, the debtor/wife did not look for another job. She testified that she had suffered a number of health problems, and had had to undergo a surgical procedure. She anticipated undergoing another surgery in the near future. She believed that after this second surgery, she would eventually be capable of working, but at the time of the hearing, she was not physically able to do so.

B.     The Circumstances Which Prompted the Debtors to File.

The debtor/wife testified that the debtors had filed for bankruptcy because they no longer could pay their bills, and because the cleaning and vending machine businesses had failed. The debtor/husband testified that he had realized in October 2007 that he needed to file bankruptcy; up to that point, he was borrowing money to pay bills, mostly by using credit cards. He testified that as the debtors fell deeper into debt, he made only the minimum payment on most of the credit card accounts, and thus a significant portion of the debtors' scheduled credit card debt was attributable to accrued interest.[1] The debtor/husband also had taken out a loan from his 401k plan, as well as an $11,000 personal loan, to pay for losses incurred by the vending machine business.

C.     The Debtors' Assets.

The debtor/wife testified that she drove a 2001 Camry, and that her husband drove a Ford Mustang and a 2002 Harley Davidson motorcycle.

---

[1]  The debtor/husband testified that, as the couple's debt increased, the interest rate on his credit cards increased, and that the highest interest rate was 30%.

5

With regard to the Ford Mustang, the debtor/husband testified that he had reaffirmed that debt because the loan was almost paid in full. He testified that he did not attempt to sell the Mustang prior to filing for bankruptcy because he did not believe he could find another car that was as cheap and reliable as the Mustang.

With regard to the motorcycle, the debtor/husband testified that he had purchased it new for $20,000, but that on the petition date he had valued it at $9,000 because that is what he believed that he could sell it for. (The debtors' Schedule B actually valued the motorcycle at $7,000, not the $9,000 he recalled at the hearing.) The debtor/husband admitted during the hearing that prior to filing for bankruptcy, he never considered selling the motorcycle and using the proceeds to pay his creditors.

A couple of months after filing their petition, the debtors filed an amended Schedule B indicating that they anticipated receiving a tax refund of $7,000 for the tax year 2007. The debtor/husband testified that this refund was larger than normal because on their 2007 return, the debtors had deducted the $11,000 loss from the vending machine business. The debtors had received the refund, and had used it to pay property taxes in the amount of $3,200, and to put tires on the debtor/husband's car. The debtor/husband testified that he had not changed any of his deductions since he filed for bankruptcy.

D.   Discrepancies in the Debtors' Financial Records.

During the debtor/husband's testimony, the trustee asked him to review the reaffirmation agreement that he signed for the Mustang. The trustee directed him to page 8 of the agreement, which stated that the debtors' current monthly income was

6

$4,850.03. The trustee asserted that that amount was inaccurate, and questioned the debtor/husband regarding why that would be the case. The debtor/husband responded that when he signed the form, someone else already had filled in the income numbers. He conceded that he did not review the form in detail before signing it. He knew it was a reaffirmation agreement for the Mustang, and so he signed it. Similarly, he conceded that he had not reviewed the statement on the form which indicated that his other, post-bankruptcy debts totaled $4,412.

The trustee also questioned the debtor/husband about the fact that the debtors' joint tax return for 2007 indicated that the debtors had sold the 2001 Camry. The debtor/husband testified that he had prepared the return himself using a software program, and that he had been trying to show a depreciation in the car's value as a result of the mileage the debtor/wife put on the car when she used it for the vending machine business. He testified that the fact that the return indicated that the Camry had been sold was a simple mistake, which resulted when he tried to show the depreciation. The debtor/husband conceded that, because of this mistake, he likely would owe the taxing authority, and would have to return a portion of the 2007 refund.

The trustee also questioned the debtor/husband about the amount of income he earned in 2007. Other than the debtor/wife's single month of income from JJ Freight in December 2007, the debtor/husband had earned all of the household wages for 2007. On the 2007 tax return, the debtor/husband reported $64,817 in wages. (*See* Ex. 209.) According to his December 31, 2007 pay stub, however, his 2007 wages totaled $72,741.57–a difference of some $8,000. (See Exhibit 207.) The debtor testified that

7

his tax return showed a lower income than his pay stub because he believed that some of the pay stub income was not reportable.

The debtor/husband testified that he had three bank accounts. He estimated that he had $1,400 in one account, $500 in the second and $25 in the third. At the hearing, the trustee questioned both the debtor/husband and his son, James, Jr., about the fact that one of these accounts apparently contained funds belonging to James, Jr. and JJ Freight. James, Jr. testified that while JJ Freight had a business bank account, James, Jr. rarely had used it. Rather, he regularly deposited money into an account in his father's name at the Great Midwest Bank. James, Jr. stated that while he had gone with his father to open that account, he believed it was possible that his father was listed as the account's sole owner. Nonetheless, James, Jr. testified that the funds in that account were for his business, and that his father used the money only to pay his son's bills while James, Jr. was on the road making deliveries. James, Jr. testified that he did not believe he had signed a signature card for the account. He testified that sometimes he used the automatic teller machine card to access the account, but that it was his father who gave him the personal identification number for the card. While the debtor/husband had more than one account at Great Midwest Bank, James, Jr. was unable, when pressed by the trustee, to identify which of those accounts his father used to pay James, Jr.'s bills.

E.    The Amended Schedules I and J.

On their original Schedule I, the debtors stated that the debtor/wife earned $1,083.33 per month at JJ Freight, and the debtor/husband earned $6,329.96 per

8

month. They deducted from their gross income $468.04 for "voluntary 401k contributions" and $580.90 for "life insurance, uniforms, 401k loan." The Schedule I showed their combined monthly net income as $4,863.55. Their original Schedule J showed their average monthly expenses as $4,846.60. Subtracting the expenses listed on Schedule J from the income on Schedule I left the debtors with a monthly net income of $16.95.[2]

Several months after the petition date, on the eve of the hearing on the motion to dismiss, the debtors filed amended Schedules I and J. On the amended Schedule I, they had deleted the debtor/wife's income, as well as the deduction for the "voluntary 401k contributions." They deducted only $137.26 for "life insurance, uniforms, 401k loans." With these changes, the amended Schedule I showed a combined monthly net income of $4,691.90.

On their amended Schedule J, the debtors increased their budget for transportation from $262.00 to $542.00. In addition, they listed a new deduction of $117.00 per month for automobile insurance. The amended Schedule J showed total average monthly expenses of $5,243.60. When deducted from the income on the amended Schedule I, the amended Schedule J showed that the debtors had a net monthly *loss* of $551.70.[3]

---

[2] The original Schedule J stated that the debtors had a net monthly income of $3.43. This is incorrect–subtracting monthly expenses of $4,846.60 from monthly income of $4,691.60 leaves a net monthly income of $16.95.

[3] Amended Schedule J is mathematically incorrect.

9

At the evidentiary hearing, the debtors' attorney revealed that the debtors were, in fact, continuing to make all of the 401k contributions and loan repayments that they had listed on the original Schedule I, and that the amended schedules did not reflect the state of the debtors' finances at the time of the hearing. He stated that the amended schedules did not constitute a concession that the 401k payments and 401k loan repayments were not reasonably necessary for the debtors' support and maintenance. Rather, he indicated that he had had the debtors complete and file the amended schedules as an "illustration," to show that, even if the debtors stopped contributing to their 401k account and repaying their 401k loan, they still would not have sufficient disposable income to make a meaningful repayment to their unsecured creditors.

The trustee and the Court expressed consternation that counsel for the debtors had advised the debtors to sign and file what he admitted were inaccurate schedules. The trustee argued that this was evidence of bad faith on the part of the debtors, and asked the Court to strike the amended schedules. Counsel for the debtors stated that he had not meant to mislead the Court or the trustee, and conceded that having the debtors file the schedules was inappropriate. From the bench, the Court granted the trustee's motion to strike the amended schedules.

## II.  THE ARGUMENTS OF THE PARTIES

A.    The United States Trustee's Arguments.

In her written motion, the trustee moved to dismiss the case pursuant to 11 U.S.C. § 707(b)(3)(B), alleging that the totality of the debtors' financial circumstances

10

demonstrated abuse. Specifically, the trustee pointed to two facts in support of this argument. First, she noted that the debtors voluntarily were contributing $468.04 of their gross income per month to their 401k plan, and were paying $443.64 per month to repay the loan the debtor/husband had taken from the 401k account. She argued that those payments were not reasonably necessary for the debtors' maintenance or support, and that the Court should include those amounts in calculating the debtors' ability to repay their debts. Second, the trustee argued that the debtors' anticipated 2007 tax refund should be converted into monthly chunks and added to the debtors' monthly disposable income.

The trustee calculated that, by adding back the 401k payments and the tax refund amounts, the debtors' monthly disposable income would increase such that they could make a meaningful repayment to their creditors.

At the hearing, the trustee orally raised a second basis for the motion to dismiss. She asked the Court to dismiss the case under § 707(b)(3)(A) because the debtors had filed their petition in bad faith. In support of this claim, the trustee pointed to the fact that the debtors had filed amended Schedules I and J two days prior to the hearing on the motion to dismiss. She also pointed to the fact that the debtor/wife worked at JJ Freight for only one month, implying that the debtor/wife could have continued to work and provide income to repay unsecured creditors.

B.     The Debtors' Arguments.

The debtors responded that the loss of the debtor/wife's income meant that even if the debtors were not allowed to deduct the 401k contribution and loan payment, they

11

still had suffered a reduction of $1,083.33 in their monthly income, which meant that they did not have sufficient income to make a meaningful repayment to their unsecured creditors over the course of a Chapter 13 plan. The debtors further objected to the trustee's argument that the Court should convert their 2007 tax refund to monthly amounts and add it to their monthly disposable income.

## III. JURISDICTION

The issues in this case involve core proceedings under 28 U.S.C. § 157(b), and thus the Court has jurisdiction under 28 U.S.C. § 1334(b).

## IV. LEGAL ANALYSIS

A.     <u>Burden of Proof</u>.

The trustee's written motion relied on 11 U.S.C. §§ 707(b)(1) and (3)(B). Section 707(b)(1) states that a court "may dismiss a case filed by an individual debtor under this chapter . . . if it finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1). Section 707(b)(3)(B) states:

> In considering under paragraph [(b)](1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider-
>
> (B) [whether] the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3)(B). The trustee "carries the burden of establishing by a preponderance of the evidence" that the totality of the circumstances of the debtors'

financial situation demonstrates an abuse of the provisions of Chapter 7. <u>In re Beckerman</u>, 381 B.R. 841, 844 (Bankr. E.D.Mich. 2008).

The trustee based her oral addition to the motion on § 707(b)(3)(A), which states that in considering whether to dismiss under § 707(b)(1), a court should consider "(A) whether the debtor filed the petition in bad faith." The trustee also carries the burden of proving that the debtors filed their case in bad faith. <u>In re Baum</u>, 386 B.R. 649, 652 (Bankr. N.D.Ohio 2008).

Under § 707(b)(3)(B), the Court must look at the totality of the debtors' *financial* circumstances, and under § 707(b)(3)(A), the Court must look at the totality of *all* of the debtors' circumstances. The inquiries are interrelated. The Court begins by looking at the more narrow issue, the totality of the debtors' financial circumstances, in determining whether to grant the trustee's motion to dismiss.

B.    <u>The Totality of the Debtors' Financial Circumstances Demonstrates an Abuse of the Provisions of Chapter 7</u>.

The trustee argued, both in her written motion and at the hearing, that the debtors' case constituted an abuse because the totality of the debtors' financial circumstances showed that they had the ability to fund a Chapter 13 plan. The Court finds that she has met her burden in that regard, and further finds that more than just the debtors' ability to pay requires dismissal.

13

1.     **The Totality of the Evidence Indicates that the Debtors Have Some Ability to Pay.**

      a.    Debtor/Wife's Unemployment.

The trustee spent some time on the fact that the debtor/wife, while employed on the petition date, had ceased to work almost immediately upon filing for bankruptcy. While the trustee did not say so directly, she implied that the debtor/wife had chosen not to work, and thus was depriving the couple's creditors of the income she was capable of making.

The evidence does not support this assertion. The debtor/wife's testimony indicated that, throughout her adult life, she had made various efforts to obtain employment. Those efforts had failed, either due to lack of skills or physical inability. Her testimony, and that of James, Jr., established that she had not quit her job at JJ Freight–she had been let go. The trustee did not produce evidence to contradict that assertion. The debtor/wife testified that she suffered from health problems that prevented her from working at the time of the hearing, and the trustee did not produce any evidence to contradict that testimony. The debtor/wife testified that she hoped to become healthy enough to work in the future, and perhaps she will. The Court does not, however, conclude that her current unemployment status is "voluntary," such that it demonstrates an ability to pay.

14

b.    Retirement Plan Payments.

The trustee alleged that the debtors voluntarily were contributing $468.04 each month to their 401k plan, and $443.64[4] per month to repay the 401k loan. The trustee argued that those payments were not reasonably necessary for the support and maintenance of the debtors, and argued that if the Court prevented the debtors from deducting those amounts from their disposable income, they would have $771.24 available to pay unsecured creditors each month in a Chapter 13.[5]

In support of this argument, the trustee asserted that "[i]n numerous published opinions, the bankruptcy courts held that retirement contributions and loan repayments were not the kind of expenditures that were reasonably necessary for the debtor's support and maintenance and therefore would be considered in calculating the debtor's disposable income and ability to repay the debtor's debts." (Docket No. 20 at 3) She then cited a string of six cases, only two of which analyzed

---

[4] It appears that the trustee arrived at this figure by subtracting the amount deducted by the debtors for life insurance and uniforms ($137.36 on the debtors' amended Schedule I) from $580.90, the amount listed on the original Schedule I for life insurance, uniforms and/or a 401k loan.

[5] The trustee calculated this amount as follows: First, the trustee noted that the debtors contributed $468 to their 401k plan. Then the trustee multiplied $468 by .70, presumably to account for the taxation that would occur if the debtors did not deduct this amount to place into the 401k plan prior to taxation. Multiplying these two numbers together, the trustee concluded that, after taxation, the debtors would receive a net income increase of $327.60 by foregoing the 401k contributions. The trustee then added $327.60 to $443.64 (the amount paid into the 401k loans), and arrived at an added net monthly income of $771.24.

15

the issue in a post-BAPCPA context. This was the extent of the trustee's legal argument with regard to 401k expenses.

The debtors did not respond to the United States Trustee's argument. Rather, they asserted that even if the Court added back in to their available income the amounts they were contributing to the retirement account, they still would not have sufficient funds to pay unsecured creditors in a Chapter 13.

      i.    There is no evidence regarding whether the debtors' voluntary 401k contributions are reasonably necessary for their support and maintenance.

The Court first considers the voluntary monthly contribution of $468.04 to the debtor/husband's 401k plan. Is such a voluntary contribution "reasonably necessary for the support and maintenance" of the debtors? In the post-BAPCPA, dismissal-of-Chapter-7-under-the-totality-of-the-circumstances context, courts have fallen into two camps. One camp has found that the answer to the question depends on the reasonableness of the amount of the contribution in light of the totality of the debtor's circumstances. *See* In re Beckerman, 381 BR 841, 848 (Bankr. E.D.Mich. 2008); In re Nolan, 2008 WL 2121143 (Bankr. N.D.Ohio 2008); In re Tucker, 389 B.R. 535, 540-541 (Bankr. N.D.Ohio 2008). The second camp answers the question with an unequivocal "no," reasoning that "debtors should not be permitted to pay themselves money at the expense of creditors." In re Parada, 391 B.R. 492, 503 (Bankr. S.D.Fla. 2008). *See also*, In re Haynes, 2008 WL 205223 (Bankr. M.D.Pa. 2008)

16

The Court notes that neither party presented evidence regarding whether the voluntary contribution of $468.04 was reasonably necessary for the debtors' support and maintenance. Courts in the first camp have looked at evidence such as the debtors' age, the amount of their existing retirement savings, the amount of time they have left until retirement, the debtors' health, the needs of any dependents and the overall budget to determine whether the contributions are "reasonably necessary." *See*, *e.g.*, In re Beckerman, 381 B.R. at 848 (citing Hebbring v. U.S. Trustee, 463 F.3d 902, 907 (9th Cir. 2006), In re Taylor, 243 F.3d 124, 129-30 (2d Cir. 2001)).

The trustee, who carries the burden of proof, did not present any evidence at all on any of these factors. She did not present evidence regarding the debtors' ages, the amount of time the debtor/husband had left until retirement, or the amount of their existing retirement savings. She presented no evidence regarding the state of the debtor/husband's health, or evidence regarding the needs of any dependents. Rather, she appears to have assumed that the cases she cited disposed of the issue without the need for her to present any evidence, and she does not appear to have considered the possibility that the Court might have reached the kind of conclusion courts in the first camp reached. Nor did the debtors attempt to rebut the trustee's arguments by presenting evidence on most of these factors. While the debtor/wife testified that she had suffered health problems that made her unable to work at the time of the hearing, she did not testify as to the state of her long-term health.

17

In short, the Court has absolutely no evidence either to support or to refute the trustee's assertion that the voluntary contributions were not reasonably necessary for their support and maintenance. Nonetheless, for reasons the Court will discuss shortly, it does not include the $468.04 that the debtors are contributing to the 401k in calculating whether they have an ability to pay.

> ii. There is no evidence regarding whether the payments the debtors are making on the loan they took from the 401k are reasonably necessary for their support and maintenance.

The Court next takes up the trustee's argument that the $443.64 the debtors pay each month to repay the loan they took from the 401k was not "reasonably necessary" for their support and maintenance. As do the cases regarding voluntary 401k contributions, the cases involving repaying loans from retirement plans fall into two camps. Two of the cases cited above–In re Haynes, 2008 WL 205223 (holding that voluntary 401k contributions are not reasonably necessary and must be considered as disposable income) and In re Tucker, 389 B.R. 535 at 540 (holding that courts must consider the reasonableness of such voluntary contributions in light of the totality of the circumstances)–apply their conclusions to 401k loan repayments as well. *See also*, In re Cribbs, 387 B.R. 324 (Bankr. S.C. Ga. 2008) (debtors who failed means test could prove circumstances surrounding 401k loan constituted special circumstances). Again, then, evidence regarding the facts and circumstances surrounding the 401k loan could have been persuasive. Again, the trustee carries the burden of proof, and again, she did not present any evidence

18

supporting her assertion that the payments were not reasonably necessary.  Nor did the debtors attempt to refute the assertion by presenting any evidence.

> iii.     Even if the Court were to conclude that he fact the 401k contributions and loan payments are not reasonably necessary, it does not follow that these sums, standing alone, would provide the debtors with an ability to pay.

The Court need not determine whether voluntary retirement contributions never can, or sometimes can, constitute "reasonable and necessary" expenses.  First, the Court notes that neither party presented evidence regarding whether there would be tax consequences if the debtors stopped making the voluntary contributions.  The Court suspects that such consequences would ensue, and thus that the debtors would have something less than the $468.04 the trustee computed available were they to stop making those contributions.

Beyond that, there is the conundrum created by the difference in BAPCPA's treatment of qualified plan contributions in Chapter 7 and Chapter 13 cases.  The Form B22A which a Chapter 7 debtor completes to determine whether her case gives rise to a presumption of abuse does not allow her to subtract such payments from her current monthly income.  In contrast, the Form B22C which Chapter 13 debtors fill out to determine the amount of disposable income they have available to pay unsecured creditors *does* allow them to subtract, on Line 55, "the monthly average of (a) all contributions or wage deductions made to qualified retirement plans . . ."

19

Thus, the conundrum: the Chapter 7 debtor cannot subtract his 401k contributions as reasonably necessary expenses, so those amounts count as funds available to pay creditors. Yet as soon as he converts his case to a Chapter 13 so that he can begin paying his creditors, he can deduct those same amounts from the "disposable income" available to pay those creditors. If those amounts were the only amounts he had available to pay his unsecured creditors, the exercise of denying him Chapter 7 relief on the ground that he had an ability to pay his creditors would seem to have been an exercise in futility.

Courts have recognized this conundrum. Some have begun and ended their consideration of the problem by stating that such payments are not "reasonably necessary" for Chapter 7 debtors, and therefore that whether the payments could be deducted in a Chapter 13 scenario is not germane to the discussion. *See*, *e.g.*, In re Edighoffer, 375 B.R. 789, 798-99 (Bankr. N.D.Ohio 2007), In re Smith, 388 B.R. at 889. Others, including this Court's colleague, Judge Kelley, have concluded that in cases where the only funds the debtor would have available to pay her unsecured creditors in a Chapter 13 are the qualified plan contributions that she rightfully could make in a Chapter 13, such that conversion to a Chapter 13 would yield no dividend to her unsecured creditors, dismissal is not appropriate. In re Mravik, 08-28754-svk, slip op. at 7 (Bankr. E.D.Wis. Dec. 31, 2008).

This Court is not much interested in engaging in exercises in futility, and were this a case in which the only funds the debtors might have available to pay unsecured creditors were the $468.04 they pay each month into the 401k, it would

20

be disinclined to grant the trustee's motion.  But in this case, there is more to the trustee's ability-to-pay argument than the voluntary 401k contributions.

The debtors also pay $443.64 per month to repay the loan the debtor/husband took from the 401k account.  Again, the Form B22A means test form does not allow debtors to subtract such loan payments.  Some enterprising debtors have tried to subtract their retirement loan payments on Lines 42 or 43 as payments on secured debt.   Their arguments have been rebuffed by the courts.  *See*, *e.g.*, <u>In re Lenton</u>, 358 B.R. 651, 658-60 (Bankr. E.D.Pa. 2006); <u>McVay v. Otero</u>, 371 B.R. 190, 203 (W.D.Tex. 2007); <u>Eisen v. Thompson</u>, 370 B.R. 762, 772 (N.D.Ohio 2007); <u>In re Turner</u>, 376 B.R. 370, 376 (Bankr. D.N.H. 2007); <u>In re Smith</u>, 388 B.R. 885, 887-88 (Bankr. C.D.Ill. 2008). [6]

But as with qualified plan contributions, Form B22C does allow debtors to subtract, on Line 55, "(b) all repayments of loans from retirement plans . . . ."  A Chapter 13 debtor's ability to subtract 401k loan payments comes from 11 U.S.C. § 1322(f), which states that "[a] [Chapter 13] plan may not materially alter the terms of a loan described in section 362(b)(19) and any amounts required to repay such loan shall not constitute 'disposable income' under section1325."

---

[6]  Chapter 7 debtors faced with the presumption of abuse–in other words, who have failed the means test–also have attempted to argue that the need to repay their 401k loans constitutes "special circumstances," which under 11 U.S.C. § 707(b)(2)(B) can rebut the presumption.  This argument has met with mixed success.  *See* <u>In re Turner</u>, 376 B.R. 370 at 379; <u>In re Smith</u>, 388 B.R. 885 at 888.  *But see*, <u>In re Cribbs</u>, 387 B.F. 234 (Bankr. S.D.Ga. 2008); <u>In re Martin</u>, 371 B.R. 347, 357 (Bankr. C.D.Ill. 1007).

Case 07-30434-pp    Doc 34    Filed 01/05/09    Page 21 of 39

Some courts have posited that, with regard to repayment of 401k loans, the Code's disparate treatment of such loan repayments in the Chapter 7 and Chapter 13 contexts does not pose quite the conundrum that a first glance indicates.  In <u>In re Lenton</u>, the bankruptcy court summarized the problem thus: "Why, posits Debtor, would Congress presume under § 707(b)(2)(A) that amounts paid for 401(k) loan repayments could be used to pay unsecured creditors, yet deny unsecured creditors access to those funds in a Chapter 13 bankruptcy?"  <u>In re Lenton</u>, 358 B.R. at 659.  The Court answered that question as follows:

> Debtor's argument . . . ignores two important realities.
> First, 401(k) loan repayments are finite; a loan will
> eventually be paid off.  Second, a Chapter 13 case is
> prospective, *i.e.*, it encompasses a debtor's current and
> future financial circumstances for a period of three to five
> years.  Section 1322(a) requires that a Chapter 13 plan
> "provide for the submission of all or such portion of *future*
> earnings or other *future* income of the debtor to the
> supervision and control of the trustee as is necessary for
> the execution of the plan.  *Id.* (emphasis added).  Section
> 1325(b)(1)(B) requires debtors to use all of their "*projected*
> disposable income" over a commitment period of three to
> five years.  *See e.g. In re McPherson*, 350 B.R. 38, 43-44
> (Bankr. W.D. Va. 2006).  Furthermore, § 521(f) requires a
> debtor, upon request, to file tax returns and updated
> statements of income and expenses during the pendency
> of the case.  Excluding 401(k) loans from the means test
> evidences a "wait and see" approach that would channel
> debtors with such expenses into the longer period of
> bankruptcy supervision of Chapter 13 rather than the
> relatively short tenure of a Chapter 7 case,
> notwithstanding that doing so might result in a zero
> payment plan.  However, because, as here, 401(k) loans
> might be paid off within the commitment period of a
> Chapter 13 case, the ability to increase the monthly plan
> payment would direct newly available funds to creditors.
> Such an approach serves both the Congressional intent to

22

> protect retirement contributions and "ensure that debtors
> repay creditors the maximum they can afford," a primary
> goal of BAPCPA.  H.R. Rep. 109-31, pt. 1 at 1, *as
> reprinted in* 2005 U.S.C.C.A.N. 88, 89 (2005).

Id. at 660.

The Lenton court's reasoning has convinced other courts that excluding retirement loan repayments as "reasonably necessary" expenses in Chapter 7, while allowing their deduction from disposable income in Chapter 13, is not such an absurd result.  *See* Eisen v. Thompson, 370 B.R. 762, 771 (N.D.Ohio 2007); In re Turner, 376 B.R. 370, 376-77 (Bankr. D.N.H. 2007).

In the current case, the trustee did not present any evidence or testimony about how much the debtors had left to repay on the $11,000 loan they took out from the 401k, or about whether the loan would be paid off during the five-year commitment period of an above-median-income debtor's Chapter 13 plan.  Thus, even were the Court to conclude that the loan repayments were, at this point, "reasonably necessary" expenses, it cannot determine whether they would cease to be reasonably necessary at some point during the duration of a Chapter 13 plan, thus giving the debtors an ability to pay something to their unsecured creditors at that future point.

So—even if the Court were to conclude as a legal matter that the 401k contributions and loan repayments were not reasonably necessary and that the debtors should stop making them, there is no evidence regarding how much of that amount would be available, given the likely tax consequences.  Further, it seems

23

clear that even were the Court to conclude as a legal matter that the voluntary 401k

contributions were not reasonably necessary expenses, the debtors nonetheless

would be able to deduct those in a Chapter 13 scenario, and thus that those

amounts would not be available to pay unsecured creditors. Finally, even were the

Court to conclude as a legal matter that the 401k loan repayments *were* reasonably

necessary expenses now, it is not clear that they would continue to be reasonably

necessary throughout the life of a Chapter 13 plan. Accordingly, the Court is

unable to conclude, as the trustee urged it to do, that the debtors have $771.24

available to pay their unsecured creditors as a result of the 401k payments. The

Court must look further, to see if there the trustee has demonstrated the existence

of other sources of funds the debtors have not tapped which could give them an

ability to pay.

        c.     Tax Refund.

The trustee argued that the $7,000 tax refund for 2007, which the debtors

listed as anticipated income on their schedules and later received, should be

converted into a monthly amount and added back into the debtors' monthly

disposable income. She argued that this would raise the debtors' disposable income

by $408 per month.

The debtors filed their petition on December 31, 2007–the last day of the

2007 tax year. The $7,000 refund was for that tax year. Numerous courts have

held that "the portion of an income tax refund that is based upon the pre-petition

portion of a taxable year constitutes property of the bankruptcy estate." <u>Borowsky</u>

24

v. Serelson, 946 F.2d 1516, 1518 (10th Cir. 1991) (string citations omitted).  *See also, e.g.*, In re Marvel, 372 B.R. 425, 433-34 (Bankr. N.D.Ind. 2007); In re Innis, 331 B.R. 784, 786 (Bankr. C.D.Ill. 2005) ("It is well established that the prepetition portion of a tax refund, falling within the definition of "all legal or equitable interests of the debtor in property as of the commencement of the case," is property of the bankruptcy estate under Section 541(a)(a)"); In re Robinson, 152 B.R. 956, 957-58 (Bankr. E.D.Mo. 1993); In re Violanti, ___ B.R. ___, 2008 WL 5211006 (Bankr. N.D.Ohio 2008).

Thus, the Court concludes that the tax refund should have been treated as property of the Chapter 7 estate.  As was the case with the retirement fund contributions and loan repayments, however, it is not clear what impact this determination has on the debtors' ability to pay.  When the trustee argues that a debtor's tax refund gives that debtor the ability to pay something to her creditors, the trustee must prove by a preponderance of the evidence that some of that refund would be available to creditors in a Chapter 13 context.  In this case, the trustee appears to have assumed that were this Court to rule that the tax refund was estate property, $7,000 would be available to pay unsecured creditors.  She divided $7,000 by 12, multiplied that number by .70, and came up with $408 per month that would be available to unsecured creditors through the refund.

With all due respect, it is not that simple.  As an initial matter, the Court recalls that the trustee elicited from the debtor/husband a concession that he likely would be required to return some of the 2007 refund to the taxing authorities in

25

light of the fact that the 2007 return incorrectly reflected that the debtors had sold the Camry. So the amount of the refund actually available to either the debtors or the estate may end up being less than $7,000. Even further, the Court notes that while the debtors did not respond to the trustee's argument on this basis, their Schedule C shows that they had claimed $3,000 of the anticipated refund as exempt under the wild card provision of 11 U.S.C. § 522(d)(5). At this point, no one has challenged this exemption.

The debtors *did* respond, however, by arguing that such a large refund was unusual for them, and that they had gotten the large refund for 2007 only because they had written off the $11,000 business loss they had suffered through the demise of the vending machine business. The implication was that they would not be getting such large refunds in the future, so any ability this refund might have given them to pay unsecured creditors was a one-off. In the Court's view, this argument disregards the fact that the debtors were beneficiaries of their ability to write off that loss, when their creditors could have benefitted instead.

The Court does not know whether the $7,000 refund for 2007 was a one-off. Neither the trustee nor the debtors presented any evidence regarding what the debtors' refund would have been had they not written off the business loss in 2007. The Court does not know, for example, whether the debtors still might have received a sizeable refund due to over-withholding. At least one court has rejected the "we-won't-get-such-large-refunds-in-the-future" argument in a case where the debtors apparently were over-withholding. In <u>In re Violanti</u>, the bankruptcy court

26

for the Northern District of Ohio stated, "To be sure, the Debtor . . . may not receive tax refunds in the future, much less a refund of $6,00 as occurred for the 2007 tax year. But this misses the point. To the extent that the Debtor receives any tax refund, her financial figures are skewed as she is having withheld from her salary, funds beyond those which are necessary to satisfy her tax liability." 2008 WL 5211006.

But even if the refund was a one-off, it still gave the debtors a sort of windfall, so to speak, that could have provided them with some ability to make dividends to their unsecured creditors. These debtors are above-median income debtors.[7] Under BAPCPA, above-median income debtors must deduct from their disposable income the *actual* tax expense they incur. *See*, *e.g.*, Form B22C, Line 30 (instructing above-median income debtors to allows an above-median income debtor to deduct "the total average monthly expense . . . actually incur[red] for all federal, state, and local taxes"); In re Balcerowski, 353 B.R. 581, 589 (Bankr. E.D. Wis. 2006 ("an above-median income debtor must subtract on line 30 of Form B22C, to the best that he is able to estimate it, the average monthly amount of all federal, state, local, self-employment, Social Security and Medicare that he actually will incur-not the amounts that he has withheld from his paycheck"). In a Chapter 13, then, the debtors would have been able to deduct only their actual tax expenses, as best they

---

[7] The debtors' annualized current monthly income was $76,036.92 at the time of filing; the applicable median family income for a family of two in the State of Wisconsin was $52,793.

could calculate them. Any remaining balance that they might have been withholding, or any "windfall" amounts they might receive as a result of the ability to make one-time deductions on losses or depreciation, would have inured to the benefit of their creditors. The Court cannot tell how much of the $7,000 refund might have been available to pay unsecured creditors had the debtors filed a Chapter 13. But based on the debtors' own testimony that this was an unusually large refund, it appears that some of it would have been. And that demonstrates some ability to pay.

        d.      Other Factors Demonstrating Ability to Pay.

At the hearing, the trustee proved some other facts that showed an ability to pay.

The debtor/husband testified that he owned a 2002 Harley Davidson motorcycle valued at $9,000. Schedule B listed a 2002 Harley Davidson Ultra Classic with a value of $7,000. It appears that the debtors had paid off the motorcycle prior to the petition date, because they did not list among their secured creditors on Schedule D any lienholder for that collateral. In response to the trustee's questions, the debtor/husband admitted that he never had considered selling the motorcycle to pay his debts.

Neither the trustee nor the debtors presented any evidence regarding the value of the Harley, or its condition. The Court is left to speculate as to how much money the debtors might have been able to contribute to their unsecured debts had they sold the motorcycle. Undoubtedly the sale would not have yielded sufficient

Case 07-30434-pp    Doc 34    Filed 01/05/09    Page 28 of 39

funds to pay off the entire $170,000 in unsecured debts the debtors have amassed. But had they sold the bike for even $7,000, they might have been able to make a dent in one of their credit card accounts.

The trustee also questioned the debtor/husband's decision to reaffirm the debt on his 2004 Ford Mustang, arguing that he could have obtained a less expensive car and thereby freed up more money for his unsecured creditors. The reaffirmation agreement shows that the amount of the loan was $23,495. The balance remaining to be paid, and thus the amount the debtor/husband reaffirmed, was $11,163.63. The reaffirmation agreement required the debtor/husband to make monthly payments of $434.61 per month for 28 months.

The debtor/husband testified that he had reaffirmed the debt because the loan was "almost paid in full," and because he did not think he could obtain another vehicle as cheap and reliable as the Mustang. The Court cannot agree that a $23,500 loan with $11,000 still due and owing is "almost paid off." It is likely that the balance remaining is mostly interest, but nonetheless, a substantial balance remained to pay at the time the reaffirmation agreement was filed. Indeed, one could purchase a new car–albeit a decidedly un-glamorous one–for that amount, and certainly could obtain a used one for less. If the debtors reduced their car payments by even $100 per month, that would give them an additional $6,000 over the life of a Chapter 13 plan to pay unsecured creditors.

e. Conclusion Regarding Ability to Pay

The trustee's written argument implied that the Court's decision on ability to pay should be a simple, mathematical computation–add up the debtors' 401k contributions, 401k loan repayments, and 1/12 of their 2007 tax refund, and voila!–the debtors have a cool $1,179.24 per month to pay their unsecured creditors in a Chapter 13.

As one can deduce from the above discussion, the Court doesn't find the analysis quite that simple. The Court cannot conclude that the debtors' 401k contribution of $468 would be available to pay creditors–it would not be available in a Chapter 13. The Court cannot conclude that the $443 they are using to repay their 401k loan would be available, or even how much of it might be available after any tax consequences. And there is, of course, the debtors' point that, even assuming that the debtors *did* have every dime of both of those amounts available to them, the loss of the debtor/wife's JJ Freight income reduces that amount by $1,038.

But the Court concludes that the trustee has met her burden of proof on several facts showing that the debtors have some ability to pay. She has proven that the debtors received, and used, a sizable tax refund that was property of the estate. The evidence indicates that at least some of this refund–although it is not clear how much–was "windfall" due to the debtors' ability to write off a business loss. She has proven that the debtors have a fully-paid-off motorcycle with more than nominal value, which they did not even consider selling to pay creditors. She

30

has proven that they have chosen to reaffirm the debt on a relatively late-model vehicle, when they likely could have obtained less expensive transportation.

Do any of these facts prove by a preponderance that the debtors could pay 100% to their $170,000+ debts to unsecured creditors? No. Indeed, it is not clear how much of a dividend the combination of these amounts might yield for the creditors' benefit. But as is the point of totality-of-the-circumstances cases, the whole begins to look greater than the sum of its parts. The trustee has proven several facts which indicate that the debtors have the ability to make some payments to their creditors–and the debtors have not rebutted that showing.

      2.    **The Evidence Shows the Existence of Other <u>Nockerts/Green</u> Factors**.

As indicated above, the trustee argued that the Court should dismiss the debtors' case because they had an ability to pay their creditors. Case law in this district, however, makes clear that when considering the totality of the debtors' financial circumstances, the Court must take into account more than just the debtors' ability to pay.

In <u>In re Nockerts</u>, 357 B.R. 497 (Bankr. E.D.Wis. 2006), Judge Kelley closely examined the totality-of-the-circumstances test in the context of pre- and post-Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") law. She concluded that "the Fourth Circuit's 'totality of the circumstances' test was adopted by name in BAPCPA § 707(b)(3)(B), suggesting that *something other* than an ability to pay is required to succeed on a Motion to Dismiss under this section." <u>Id.</u> at

505-506.  She reasoned that "[i]nterpreting the § 707(b)(3) test as requiring proof of more than the ability to fund a chapter 13 plan gives appropriate weight to the statutory means test, which is . . . the Congressional formula for determining ability to pay."  Id. at 506.  She opined that, "while the ability to pay is a factor in the totality of the circumstances test, and may even be the primary factor to be considered, if it is the only indicia of abuse, the case should not be dismissed under that test."  Id. at 507.  Judge Kelley concluded that, "similar to the old totality of the circumstances test, more than an ability to pay (as shown on the debtor's Schedule I and J) must be shown to demonstrate abuse under § 707(b)(3)(B).  This additional evidence may include the Green factors, or may point to a manipulation of the means test."  Id. at 507-08.

Accordingly, a court in this district administering the totality-of-the-circumstances test must consider a debtor's ability to pay, but also must consider factors such as:

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
>
> (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
>
> (3) Whether the debtor's proposed family budget is excessive or unreasonable;
>
> (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
>
> (5) Whether the petition was filed in good faith.

32

Id. at 506 (quoting Green v. Staples (In re Green), 934 F.2d 568, 572 (4th Cir.1991)). A review of these other factors shows that more than just the debtors' ability to pay weighs in favor of dismissal.

Nockerts advises a court to look at "whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment." Id. None of those factors were present here. While the debtor/wife testified that she had suffered from medical problems, there was no testimony that she had had a sudden illness which caused the debtors to file, or that the debtors' financial problems were the result of medical bills. The debts listed in the schedules do not appear to be medical debts. As noted above, the debtors' unsecured debt consists of credit card and loan debt. The debtor/husband testified that the debtors incurred their debt because the vending machine and cleaning businesses failed. But rather than demonstrating the existence of a "sudden calamity," this testimony demonstrated a slow debt creep–the cleaning business, for example, came to an end some three years prior to the petition date. The debtor/wife testified that she could not work, but there is no evidence that this was a sudden disability. The debtors did not file due to the debtor/wife's unemployment–she was still working for JJ Freight when they filed.

Nockerts and Green also advised courts to consider "whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay." Id. The schedules indicate that this may have been the case. The majority of the debtors' unsecured debt is credit card and loan debt. There appears to be little or no medical debt, and no priority tax debt. The debtors had, at the time they filed, ownership

33

interest in five vehicles–the Mustang, the Harley, the Camry, the Dodge Sprinter, and James Jr.'s Dodge Ram. Yet their household consisted of only two people.

Nockerts and Green advise courts to consider "whether the debtor's proposed family budget is excessive or unreasonable." Id. The Court already has discussed the fact that the debtors included in their budget payments on the Ford Mustang that likely could be reduced with the purchase of cheaper transportation. The trustee also questioned the arrangement between the debtor/husband and James, Jr. regarding the bank account at Great Midwest Bank, and opined that this arrangement was unusual. She did not articulate what it was about that arrangement that supported a finding of abuse. Perhaps the trustee suspected, and meant to imply, that the debtors were supporting and financing their son's business–that the money in the account was not income from JJ Freight, but was the debtors' income. If the debtors were financing their adult son's business with their income–an inference supported by their ownership interest in James, Jr.'s Dodge Ram–they were doing so at the expense of their creditors.

Nockerts and Green advise courts to consider "whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition." Id. There is no question that the *amended* schedules which the debtors inadvisably filed on the eve of the hearing on the motion did not accurately reflect their true financial condition–their counsel admitted as much. The Court struck those schedules at the trustee's request, and does not consider those in determining whether the original schedules reflected the debtors' true financial situation.

34

The trustee pointed out that the reaffirmation agreement for the Mustang showed the debtors' income as $4,850.03, even though that figure was different than the figures reflected on the Schedule I. The debtor/husband responded that he did not read the reaffirmation form carefully before signing it, and that the form already had been filled out before he signed it. The Court has no reason to doubt the debtor/husband's testimony in this regard, and further notes that the difference between the two numbers is nominal. Schedule I listed the income as $4,863.55, and the reaffirmation agreement listed the income as $4,850.03–a different of about $13.00. This discrepancy does not deem the schedules substantially inaccurate.

Nor does the fact that the debtors' 2007 tax return incorrectly showed a sale of the Camry deem the schedules substantially inaccurate. The debtor/husband acknowledged that the returns should not have indicated that the debtors had sold the Camry, explaining that he had been trying to deduct the depreciation value of the Camry in connection with the failed vending machine business, and had erroneously shown the Camry as having been sold instead. The debtors declared the Camry on their schedules, so this fact does not deem the schedules inaccurate.

On the other hand, the debtors' Schedule B–both the original and the amended one–showed that the debtors had $100 total in checking and savings accounts. The debtor/husband testified, however, that he had three bank accounts in his name, with a total of about $1,925 in them. This discrepancy could be attributable to the time that had passed between the date the debtors filed their petition and the date of the

35

hearing, or not. If this discrepancy stood alone, it would not demonstrate that the schedules were substantially inaccurate. But there is another issue.

The trustee pointed out a substantial discrepancy between the amount of wages the debtor/husband reported on the 2007 tax returns ($64,817) and the amount of income reflected on his pay stub ($72,741.57). The debtor/husband testified that, although his pay stub listed his yearly earnings as $72,741.57, he did not believe that all of those earnings were taxable, and he believed that the $64,817 reported as wages on his 2007 tax returns was the correct amount of his taxable income. This discrepancy is odd, and one wonders why the debtor/husband did not think that moneys which showed up on his pay stub were taxable. This discrepancy, combined with the discrepancy in information regarding the funds held in bank accounts, raises questions about whether the debtors' original schedules accurately reflected their true financial situation.

Finally, Nockerts and Green counsel courts to consider "whether the petition was filed in good faith." Id. At the evidentiary hearing, the trustee raised for the first time the argument that the debtors had filed their petition in bad faith. To support this claim, the trustee pointed out that the debtor/wife worked at JJ Freight for only one month before terminating that employment, and that she had not attempted to secure new employment after being terminated. The trustee also argued that the debtors acted in bad faith when they amended their Schedules I and J on the eve of the hearing on the motion to dismiss.

Case 07-30434-pp    Doc 34    Filed 01/05/09    Page 36 of 39

While the trustee's motion has revealed a number of problems in this case which cause one to lift one's eyebrow, the Court does not find that the trustee has met her burden of proof regarding bad faith. The trustee implied that the debtor/wife was voluntarily unemployed, but as discussed above, the uncontradicted testimony demonstrated that she (1) was let go from her last job, and (2) had medical problems which prevented her from maintaining gainful employment at the present time. The trustee did not present anything to contradict this evidence. The Court concludes that the debtor/wife's employment at JJ Freight was involuntarily terminated, and that the resulting reduction in the debtors' income was justifiable. These facts do not support a finding of bad faith.

The trustee also argued that the fact that the debtors amended their Schedules I and J on the eve of the hearing on the motion to dismiss, and that those amendments did not accurately reflect the true state of the debtors' finances, proved bad faith. The Court agrees that filing what amounted to false statements on the eve of the hearing was highly inappropriate, but it does not attribute that action to bad faith on the part of the debtors. At the hearing, counsel for the debtors indicated that he had advised the debtors to sign and file these "illustrative" schedules, and when confronted with the fact that the filing constituted false statements under oath, acknowledged that this advice was misguided. The Court admonished the debtors' attorney on the record for filing the amended schedules, and granted the trustee's motion to strike the amended schedules from the record. The debtors' attorney's legal blunder is not a basis for finding that the debtors filed their Chapter 7 case in bad faith.

Case 07-30434-pp    Doc 34    Filed 01/05/09    Page 37 of 39

The trustee did not cite any other actions of the debtors in support of her bad faith argument, but she pointed up the fact that the amount of income the debtor/husband reported appeared to differ depending on the particular document in which it was recorded. Again, while this might cause one to raise an eyebrow, without more evidence regarding the reasons for these discrepancies, the Court declines to find that they show bad faith on the part of the debtors.

Although this case does not involve all of the factors enunciated in <u>Green</u> and <u>Nockerts</u>, it involves enough of them that the Court must conclude that the totality of the debtors' financial circumstances demonstrates that their case constitutes an abuse of the provisions of Chapter 7. Accordingly, the Court need not reach, as a stand-alone basis for dismissal, the trustee's oral motion to dismiss for bad faith.

## V. CONCLUSION

The "totality-of-the-circumstances" test allows a Court the discretion to dismiss a Chapter 7 case for abuse in spite of the fact that the results of the means test did not give rise to the presumption. These debtors' case did not give rise to the presumption, but the totality of their financial circumstances convinces this Court that to allow them to obtain Chapter 7 relief would constitute an abuse. The debtors filed their petition in a tax year in which they knew they were going to receive a $7,000 tax refund. They received it, and utilized it for their own expenses when a portion of those funds could have gone toward making payments to unsecured creditors. The debtors have a motorcycle which has more than nominal value–value which, if realized through a sale, could benefit their unsecured

38

creditors. They reaffirmed a somewhat substantial debt on a car that requires them to make payments of over $400 per month. The evidence indicates that they may have been supporting their adult son and his business with their income. And they have all of this, while seeking to discharge over $170,000 of credit card and loan debt, not medical or tax debt.

In the end, it is not one single factor which causes the Court to conclude that the case should be dismissed. It is the combination of factors. BAPCPA directs courts to determine whether a particular debtor's case constitutes "abuse." Does it smell like "abuse" of Chapter 7 for debtors to have all of their credit card debt discharged while being allowed to keep a Harley Davidson (considered by many to be a luxury item) and drive a late-model Mustang, while being allowed to reap the benefits of a $7,000 tax refund, while possibly preferring to support an adult child? It does. And for those reasons, the Court must grant the trustee's motion to dismiss.

**WHEREFORE**, the Court hereby **GRANTS** the United States Trustee's motion to dismiss the debtors' Chapter 7 petition. The Court gives the debtors **thirty (30) days** from the date of this Order to convert their case to a case under Chapter 13, or the case will be dismissed without further order of the Court.

# # # # #

39